**Berniece A. SHANK, Plaintiff-Appellant,**

v.

**Al NAES; Richard Hurley; Brian Shea; Debbie Redmond; and Esther Youngdahl, Executrix of the Estate of Glenn A. Youngdahl, deceased, Defendants-Appellees.**

**No. 84–2078.**

United States Court of Appeals, Tenth Circuit.

Sept. 20, 1985.

---

Fred W. Phelps, Jr., Phelps-Chartered, Topeka, Kan., for plaintiff-appellant.

Patrik W. Neustrom, Achterberg & Neustrom, Salina, Kan., for defendants-appellees Al Naes, Richard Hurley, Brian Shea and Debbie Redmond.

William Hergenreter, Shaw, Hergenreter & Quarnstrom, Topeka, Kan., for defendant-appellee Glenn A. Youngdahl.

· Before BARRETT and MOORE, Circuit Judges, and BRETT,* District Judge.

BRETT, District Judge.

This is a civil rights action in which the plaintiff-appellant alleges a cause of action based on 42 U.S.C. § 1983. The case arises out of the arrest, imprisonment and detention of plaintiff-appellant on April 1, 1980 at Salina, Kansas.

The case was tried to a jury and the jury returned its verdict in favor of the defendants-appellees.

Plaintiff-appellant urges seven issues for review.[1] However, after analysis, the Court concludes there are three principal issues presented which are: (1) Was there sufficient evidence to support the giving of a qualified (good faith) immunity instruc-

---

* The Honorable Thomas R. Brett, United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. Issue No. 1: Whether plaintiff-appellant was entitled to a directed verdict during trial when defendants-appellees admittedly violated statutory law relating to arrest and imprisonment?

Issue No. 2: Whether the trial court erred in failing to grant plaintiff-appellant directed verdict during trial when plaintiff-appellant so moved?

Issue No. 3: Whether the trial court erred in denying plaintiff-appellant's post-trial motion for judgment notwithstanding the verdict?

Issue No. 4: Whether the trial court erred in allowing the jury to determine the good faith (or lack thereof) of defendants-appellees when defendants-appellees' conduct violated statutory law of Kansas, which law was known to defendants-appellees?

Issue No. 5: Whether the trial court erred in making prejudicial comments during trial, and in thereafter denying plaintiff-appellant's motion for new trial on that basis?

Issue No. 6: Whether the trial court erred in allowing prejudicial misconduct of certain of defendants-appellees' counsel, and in thereafter denying plaintiff-appellant's motion for new trial on that basis?

Issue No. 7: Whether the trial court erred in denying plaintiff-appellant's post-trial motions?

tion to the jury (Issues 1, 2, 3, 4 and 7 of plaintiff-appellant); (2) alleged prejudicial conduct of the court (Issues 5 and 7 of plaintiff-appellant); and (3) alleged prejudicial conduct of opposing counsel (Issues 6 and 7 of plaintiff-appellant). As hereafter related, the court concludes the judgment of the trial court should be affirmed.

At the time of trial, the plaintiff-appellant ("Ms. Shank") was a fifty-year-old white female who resided just outside of Salina, Kansas. In 1977 she was divorced from her husband which was very upsetting to her and triggered or exacerbated emotional instability. Ms. Shank had been the subject of numerous civil type complaints to the Saline County sheriff's office.

Substantial competent evidence established Ms. Shank's previous mental illness, diagnosed as paranoid personality evidenced by delusion and persecution. In 1979 a mental illness petition was filed naming her as respondent which was resolved by her brother, a resident of another state, being appointed her guardian and conservator. There was conflicting evidence concerning persons being in fear of Ms. Shank.

On April 1, 1980, Ms. Shank saw sheriff's patrol cars traveling by her house and stopping at her neighbor's home, defendant Youngdahl, next door. Earlier that day the defendant, Captain Richard Hurley, a seventeen-year veteran of the Saline County sheriff's office, had advised other deputies that someone had telephoned reporting Ms. Shank was driving an automobile with an expired tag. Hurley instructed the officers to handle the matter with caution due to Ms. Shank's history of mental illness. On April 1, 1980, it was also reported to the sheriff's office that Ms. Shank was threatening to burn her furniture in her front yard.[2] Captain Hurley's check of the neighborhood demonstrated that Ms. Shank was not engaged in such activity. The sheriff of Saline County, Kansas, is the defendant Al Naes.

Shortly after 5 P.M., on April 1, 1980, Ms. Shank drove her car from the church parking lot where she had been attending Mass. She was observed by Deputy Sheriff Brian Shea, a defendant herein, who, a few blocks from the church, signalled for her to pull over.

While Officer Shea was writing a ticket for the expired tag Ms. Shank attempted to leave the scene and at first refused to cooperate when requested to display her driver's license and vehicle registration. When Officer Debbie Redmond removed Ms. Shank's car keys from the ignition, Ms. Shank grabbed them away.

Captain Hurley was advised, came to the scene, and decided to remove Ms. Shank's car from the street and take her to the sheriff's office to determine what to do next. Ms. Shank refused to get out of her car upon the request of the defendant officer Debbie Redmond, and physically resisted being transported to the sheriff's office. She was placed in handcuffs and taken to the sheriff's office, which is also the location of the Saline County jail, at about 6 P.M. The official police report reflects Ms. Shank was arrested and incarcerated for "mental protective custody."

On the evening of April 1, 1980, or the following morning, the County Attorney of Saline County, the prosecuting officer of the county, was contacted and he instructed that Ms. Shank should be held in mental protective custody. At trial the County Attorney testified:

> I had told Captain Hurley that because of my knowledge of Mrs. Shank's problems in the past, the fact that there had been numerous reports of—from other

---

**2.** Ms. Shank had failed to make the mortgage payments on her residence of many years. Foreclosure proceedings were commenced and on October 2, 1979, her next door neighbor, the defendant Youngdahl, purchased the real property at foreclosure sale. The plaintiff had until the end of the day of April 2, 1980, to redeem her home. There was evidence that Youngdahl was moving ahead, with assistance of the sheriff's office, in obtaining possession of Ms. Shank's home on April 2, 1980, one day early. Plaintiff-appellant originally contended that Youngdahl conspired with the defendant law enforcement officers to arrest and detain the plaintiff, but subsequently abandoned this contention.

people, from other officers, that she had some problems, that there was a mental illness filed back in 1979, and that we had an evaluation from Dr. Guzman at that time indicating that Mrs. Shank was in fact mentally ill and in need of treatment, and that because also I had gotten other reports from civilians around this time of this incident in April of 1980, that she was back causing the same kind of problems.

I told Captain Hurley that I didn't feel it was appropriate to proceed with the criminal charges at that time, that we should institute mental illness proceedings and that he should contact my secretary for the purpose of having a mental illness petition filed and begin the proceedings.

... Q. Do you know in fact whether he filed that application?

A. I believe that he did. I have our file on Mrs. Shank here, and there is an application that was in the process of being completed.

While the mental illness application was being processed, Ms. Shank was held in the county jail. The only mental health facility in Saline County was at Asbury Hospital, a private hospital requiring voluntary admission.

On the evening of April 1, 1980, Captain Hurley attempted to locate a local psychiatrist, Dr. Guzman, to see Ms. Shank. Dr. Guzman was not reached until the morning of April 2, 1980, by telephone and did not interview Ms. Shank until 5 P.M. on that day. After the interview Dr. Guzman reported that Ms. Shank had agreed to commit herself voluntarily to the Asbury Hospital psychiatric unit, to which she was later transported.

On the evening of the arrest, Captain Hurley called Sister Mary Lou Roberts, a social worker at Catholic Charities in Salina and previous acquaintance of Ms. Shank. She related: "The reason he called was because he was very concerned about Berniece Shank. She had just been arrested and he asked if I could come down to visit with her, because he felt that perhaps I could help her in some way." Evidence revealed that Sister Mary Lou Roberts talked to Ms. Shank both on the evening of the arrest and the next day. In addition, Captain Hurley contacted the plaintiff's guardian and conservator and secured his approval to the voluntary commitment to Asbury Hospital.

Kansas law pertaining to detention of persons believed by a peace officer to be mentally ill and likely to do physical injury to themselves or others states:

Emergency observation; detention; authority of peace officers. (a) Any peace officer who has reasonable belief upon observation, that any person is a mentally ill person and because of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty may take such person into custody without a warrant. Said officer shall transport such person to any treatment facility where such person shall be examined by a physician on duty at such facility. If no physician is on duty at the time such person is transported to the facility, such examination shall be made within a reasonable time not to exceed seventeen (17) hours. If a written statement is made by such physician at the treatment facility that after preliminary examination such physician believes such person to be a mentally ill person and because of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty, and if such treatment facility is willing to admit such person the peace officer shall present to such treatment facility the application provided for in subsection (b) of K.S.A. 59–2909. If the physician on duty at the treatment facility does not believe such person to be a mentally ill person, the peace officer shall release such person. (b) If the physician on duty at the treatment facility states that said physician believes such person to be a mentally ill person but the treatment facility is unwilling to admit such person, or if there is no treatment facility available to re-

ceive such person within the territorial limits of the peace officer's jurisdiction, the peace officer may detain such person in any other suitable place until the close of the first day such court is open for the transaction of business, unless the court orders that such person remain in custody pursuant to the provisions of K.S.A. 59–2912. If a peace officer detains a person pursuant to this subsection, the peace officer shall file the application provided for in subsection (a) of K.S.A. 59–2912, as soon as the court is open for the transaction of business. K.S.A. 59–2908

A peace officer has the duty to file an application for an order of protective custody. The application for order of protective custody shall state the application for determination of a mentally ill person has been filed. (K.S.A. 59–2912) K.S.A. 59–2913 provides:

> ... any such application shall be accompanied by a signed statement of a physician, psychologist or the designee of the head of a treatment facility, stating that said physician, psychologist or designee has examined the person for whom the application has been filed and the results of the examination on the issue of whether such person is a mentally ill person.

The trial judge properly instructed the jury on the law of Kansas relative to peace officers detaining suspected mentally ill persons without a warrant.

The crux of plaintiff-appellant's contention is that the law enforcement defendants (Naes, Hurley, Shea and Redmond) clearly and admittedly violated the physician examination and seventeen hour provision of K.S.A. 59–2908 and therefore a directed verdict should have been sustained against said defendants and only the issue of damages submitted to the jury. The plaintiff-appellant urges that the trial court erred in submitting the issue of liability to the jury and instructing on qualified (good faith) immunity, in the face of the statutory violation.

Defendants-appellees respond by asserting that subparagraph (b) of K.S.A. 59–2908 is applicable as there is not an available treatment facility where Ms. Shank could be held in Saline County. Therefore, the defendant peace officers could detain Ms. Shank at the jail until the close of court on April 2, 1980. As Ms. Shank voluntarily consented to treatment at the Asbury Hospital psychiatric unit by 5 P.M. on April 2, 1980, defendants-appellees state the provisions of subparagraph (b) of K.S.A. 59–2908 were met.

## THE QUALIFIED (GOOD FAITH) IMMUNITY ISSUE

Instruction No. 14 of the trial court, quotes pertinent language of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The instruction states:

> By way of an affirmative defense, defendants Naes, Hurley, Shea, and Redmond allege that they acted reasonably and in good faith and, therefore, are entitled to a defense of good faith immunity. If you find by a preponderance of the evidence that defendants' conduct violated 'clearly established statutory or constitutional rights,' and that defendants reasonably knew, or should have known that their conduct would violate 'clearly established statutory or constitutional rights' you must find that defendants were not acting in good faith and are, therefore, not immune.
>
> You are instructed that the defendant law enforcement officers may rely on the advice of the county attorney only to the extent that the officers first revealed all the facts to the county attorney. The officers' reliance on the advice of the county attorney, in and of itself, does not constitute a defense. Such reliance, however, may be considered by you, along with all the other facts and circumstances, in determining whether the defendants acted reasonably and in good faith.

Plaintiff-appellant's brief acknowledges *Harlow* and the basic premise that a qualified (good faith) immunity defense is available if the defendant's "... conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."

■ The threshold question presented is, in light of the evidence before the trial court, did the conduct of the defendant law enforcement officers support submission of the liability issue to the jury and the giving of the qualified (good faith) immunity instruction? We think that it did.

The defendant peace officers had knowledge of Ms. Shank's history of mental illness and the fact she was driving an automobile with an expired license tag. Ms. Shank's uncooperative and irrational conduct at the arrest scene, coupled with her prior history, permitted invoking the process of K.S.A. 59–2908. The County Attorney was consulted and recommended proceeding under the mental illness statute. An effort was made to contact the local psychiatrist on the evening of April 1, 1980, and again the next morning. It was not until 5 P.M. on April 2, 1980, that Dr. Guzman personally consulted with Ms. Shank, and at that time she agreed to the voluntary commitment at the Asbury Hospital.

While the transporting to a physician and the seventeen-hour standards of K.S.A. 59–2908 were not strictly complied with, some ambiguity is introduced by subparagraph (b) of 59–2908 wherein it states, if there is no treatment facility available in the county the person may be held in a suitable place "... until the close of the first day such court is open for transaction of business." The evidence established there was no public treatment facility in the county, as Asbury Hospital was a private treatment facility requiring voluntary admission.

The more appropriate course of action for the defendant officers herein would have been to transport Ms. Shank to any treatment facility to be examined by an available physician as provided in K.S.A. 59–2908. However, it cannot be concluded that the failure to follow this course of action, under the facts and circumstances herein, violated a statutory or constitutional right that a reasonable person should have known, as provided in *Harlow*.

Plaintiff-appellant contends the trial court erred in permitting County Attorney Lorson to testify that any other procedure than specified in § 2908(a) could properly be followed. This testimony was received without objection. Fed.R.Evid. 103(a), (d), 28 U.S.C., and *Whiteley v. OKC Corp.*, 719 F.2d 1051 (10th Cir.1983).

■ County Attorney Lorson, who as the prosecutor, was supervising the law enforcement officer's mental illness procedure, testified that § 2908(b), which permits detention until the close of the first day such court is open for the transaction of business, was applicable. Whether County Attorney Lorson was testifying as a percipient witness, giving an explanation of the procedure followed, or as an expert as contended by plaintiff-appellant is not clear. The trial judge under F.R.E. 702, 28 U.S.C., has wide latitude in permitting expert testimony. The decision to admit or exclude such testimony will be overturned only on a showing the ruling was clearly erroneous. *Salem v. U.S. Lines Co.*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), *Padgett v. Buxton-Smith Mercantile Co.*, 262 F.2d 39 (10th Cir.1958). Irrespective of Lorson's hybrid witness status, under the facts and circumstances of this case it was not error for the county attorney to be permitted to explain to the jury the rationale for the procedure followed. The trial court made it clear in the instructions that it was the jury's province to determine from all of the evidence presented and the applicable law from the court whether a recoverable § 1983 claim had been established.

The sex discrimination cases cited by plaintiff-appellant, in which qualified immunity is not available as a defense, are inapposite because of the requirement of a finding of intent, thus precluding a finding of good faith. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). As stated in *Goodwin*

*v. Circuit Court of St. Louis County, Missouri,* 729 F.2d 541, 545 (8th Cir.1984), "the right to be free of invidious discrimination on the basis of sex certainly is clearly established, and no one who does not know about it can be called 'reasonable' in contemplation of law."

## ALLEGED PREJUDICIAL CONDUCT OF THE COURT

The trial of this case, taking two weeks, was overly protracted. Counsel for the plaintiff and the law officer defendants often tested the trial court with their argumentative and acrimonious style. The comments of the trial judge were most often the court's effort to maintain control of a vigorously contested lengthy trial in which counsel employed repetitive and argumentative trial tactics. In such a case the trial court must make all reasonable efforts to remain above the fray and maintain impartiality before the jury.

Often plaintiff-appellant has taken the trial court's comments out of context. The court has closely examined plaintiff-appellant's assertions of misconduct by the trial judge and while the judge strongly reacted at times it cannot be concluded there is grounds for a new trial. *Lane v. Wallace,* 579 F.2d 1200 (10th Cir.1978) and *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144 (10th Cir.) *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). To reiterate the specific alleged incidents herein will serve no worthwhile purpose. When the entire record is considered, any error in this regard should be classed as harmless under Fed.R.Civ.P. 61.

## ALLEGED PREJUDICIAL CONDUCT OF COUNSEL

Plaintiff-appellant asserts error due to the conduct of defendant law officers' counsel in two areas: improper prejudicial closing argument and knowingly pursuing prejudicial interrogation without admissible evidence.

The contended prejudicial closing argument by defendants' counsel is as follows:

—Mention that plaintiff was detained for questioning in reference to vandalism at the Boston Warehouse in Salina, Kansas. During trial the court sustained plaintiff's counsel's objection to questions in this regard. Plaintiff's counsel made no objection to defendants' counsel's closing argument on this subject.

—Argument relative to a conversation in which plaintiff threatened to kill herself or her former husband, Robert Shank, Sr. Plaintiff's counsel made no objection to this argument.

—Defendants' counsel argued that as there is no treatment facility in Saline County in which mentally ill persons can be held, the approximately 50 persons annually detained for mental illness are placed in a special cell. The following objection appears on the record:

MR. PHELPS: Judge, there is not one word of evidence about that.

THE COURT: That's right. I don't believe there is any.

MR. NEUSTROM: We didn't get that in? I'm sorry.

THE COURT: There is no evidence, members of the Jury.

Thus, plaintiff-appellant's objection was sustained by the court advising the jury there was no such evidence.

—Argument that witness Robert Neises' wife and others were reluctant to testify in the case as a result of being afraid of the plaintiff. During trial the court sustained an objection to this line of questioning. In closing argument counsel for the plaintiff-appellant made no objection.

—Defendants' counsel orally argued the law officers had a duty to pick up the plaintiff under the evidence herein. Defendants' counsel then stated, "I would much rather be defending this case than one where she murders someone later and someone is suing these officers for not

arresting her." No objection was made to this argument.

To preserve a question for appeal, unless plain error is involved, there must be a specific timely objection, and here there was none. *Neu v. Grant,* 548 F.2d 281 (10th Cir.1977); F.R.Civ.P. 46. The court's instructions advised the jury argument of counsel was not evidence in the case.

Relative to defendants' counsel's prejudicial interrogation knowing there was no admissible evidence, the record reflects: Defendants' counsel inquired about the plaintiff threatening violence at the Planters Bank in Salina, Kansas. The court sustained the objection to Officer Styles' testimony relative to taking a report concerning this alleged incident.

Plaintiff further complains defendants' attorneys employed prejudicial conduct in asking witness Neises if he had been convicted of a crime involving trust and veracity, referring to setting property on fire. The witness answered, "No", and the trial court did not permit further inquiry. Out of the hearing of the jury, defendants' counsel explained on the record he had investigated further and concluded any such conviction had been previously expunged.

Plaintiff-appellant's counsel states in brief: "While perhaps one or two of. such incidents may have not constituted prejudicial error, certainly all of such conduct in the aggregate constituted prejudicial error, which required that plaintiff receive a new trial."

After reviewing the alleged misconduct of counsel, the trial court stated, "Although the conduct of counsel for the defendant law enforcement officers may not have been that of a seasoned trial attorney, we find no misconduct approaching prejudicial error." We cannot conclude the trial court abused its discretion in this finding. *Durflinger v. Artiles,* 727 F.2d 888 (10th Cir.1984).

The judgment of the trial court is therefore affirmed.